1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   Amy Doescher, et al.,                      No. 2:23-cv-02995-KJM-JDP

12                        Plaintiffs,            ORDER

13          v.

14   Erica Pan,

15                        Defendant.

16

17          In this action, the parents of several school-aged children are challenging a California law

18   that prevents schools from admitting students if they cannot show they are immunized against

19   several diseases, such as measles, polio and tetanus.  The parents contend this law deprives them

20   of their First Amendment rights because vaccination contradicts their religious beliefs.  The

21   defendant, Dr. Erica Pan, MD, who is the Director of the California Department of Public Health

22   and State Public Health Officer,[1] moves to dismiss for lack of jurisdiction and for failure to state a

23   claim.  As explained in this order, four of the six plaintiffs' allegations suffice at this early stage

---

[1] Pan assumed this role in February 2025.  *See* Cal. Dep't of Public Health, Meet the Director (Feb. 1, 2025), *available at* https://www.cdph.ca.gov/meet-the-director (last visited June 13, 2025).  The court takes judicial notice of that fact.  *See Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 727 n.3 (9th Cir. 2015) ("We may take judicial notice of official information posted on a governmental website, the accuracy of which is undisputed." (citations, quotation marks and alterations omitted)).  Pan was substituted automatically in place of her predecessor as defendant when she took office.  *See* Fed. R. Civ. P. 25(d).

1    to show the court has jurisdiction, but their legal claims are not viable.  Courts have upheld

2    similar vaccination statues against similar constitutional challenges for more than a hundred

3    years.

4    **I.    BACKGROUND**

5          Although California has imposed school vaccination requirements of one kind or another

6    since the 1880s, *see, e.g.*, *Abeel v. Clark*, 84 Cal. 226, 227–28 (1890), the laws at the center of this

7    case were originally passed in the 1960s, *see* Second Am. Compl. ¶¶ 41–4, ECF No. 35;

8    1961 Cal. Stat. Ch. 837.[2]  Under a provision approved in 1961, children could not attend public

9    school in California unless they were "immunized against polio-myelitis," with two exceptions.

10   Cal. Health Code § 3380 (1961).  Children were excused from immunization if they or their

11   parents or guardian filed a "letter stating that such immunization is contrary to his or her beliefs,"

12   whether religious or otherwise.  *Id.* § 3384.  Nor was immunization required of those who

13   submitted a letter from a "licensed physician to the effect that the physical condition of the

14   [student] is such, or medical circumstances relating to the [student] are such that immunization is

15   not considered safe."  *Id.* § 3385.

16         Over the next forty years, the state amended the Health Code by adding immunization

17   requirements for measles, diphtheria, pertussis (whooping cough), tetanus, mumps, rubella,

18   *Haemophilus influenzae* type b (Hib), Hepatitis B, and Varicella (chickenpox).  *See* Req. J. Not.

19   Exs. 3–10.  In the 1970s, the immunization requirements were expanded to daycares, childcare

20   centers and similar institutions.  *See id.* Exs. 5–6.  Throughout this period, the exceptions for

21   personal beliefs and medical needs remained in place; the California Legislature consistently

22   reaffirmed its intent to make "[e]xemptions from immunizations for medical reasons or because

23   of personal beliefs."  *E.g.*, *id.* Ex. 9 (1999 Cal. Stat. Ch. 747 § 1(c)).  But in 2015, two state

24   senators introduced a bill that would remove the exception for personal beliefs.  *See* 2015 Cal.

---

[2] A copy of the original 1961 statute and the other historical statutes cited in this order are available on the docket of this action as exhibits to the request for judicial notice at ECF No. 38-2.  The court grants the request for judicial notice of those statutes.  *See* Fed. R. Evid. 201(b).

1    Stat. Ch. 35 (S.B. 277); *see also, e.g.*, Rep. Cal. Assem. Comm. on Health (SB 277) at 2 (June 11,

2    2015).[3]

3           The legislative history of this bill, commonly cited as Senate Bill No. 277 or just "SB

4    277," is "extensive." *Brown v. Smith*, 24 Cal. App. 5th 1135, 1139 (2018).  It includes a detailed

5    description of its proponents' motivations, support for it, opposition to it and potential legal

6    challenges.  *Id.*  According to a report from the Assembly Committee on Health prepared at the

7    time SB 277 was under consideration, California had become the "epicenter of a measles

8    outbreak, which spread in large part because of communities with large numbers of unvaccinated

9    people."  Rep. Cal. Assem. Comm. on Health (SB 277) at 2.  Lawmakers also had come to

10   believe that many more children were entering school without first having been vaccinated.  *See*

11   *id.*  The bill's authors asserted that less than one percent of children had claimed an exception for

12   personal beliefs in 2000, but more than three percent had done so in 2013.  *See id.*  As many as

13   one in five children had relied on the exception in some parts of the state.  *See id.*

14          The same legislative report emphasizes an epidemiological phenomenon known as "herd"

15   or "community" immunity.  *See id.* at 4–5.  If almost everyone in a given population is immune to

16   a disease or cannot spread it, then the small number of people who can be infected by that disease

17   are unlikely to encounter it and so are unlikely to contract it.  *See id.*  In turn, the small number of

18   people who cannot be vaccinated—whether by virtue of a compromised immune system, age or

19   some other reason—are protected, too.  *See id.* at 5.  Legislators were concerned in 2015 that

20   vaccination rates had declined too far in too many California communities, and they believed the

21   exception for personal beliefs was contributing to the decline.  *See id.*  They also cited an article

22   in the journal *Pediatrics*, which found schools with high proportions of students claiming

23   exceptions for personal beliefs were "clustered."  *See id.*  These clusters could permit diseases to

24   take root and spread more quickly.  *See id.*

---

[3] The court takes judicial notice of this report and the other cited records of the law's legislative history, available on the docket of this action as exhibits to defendant's request for judicial notice at ECF No. 38-2.  "Legislative history is properly a subject of judicial notice." *Anderson v. Holder*, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012).

Controversies about vaccine laws are nearly as old as vaccines themselves.  *See, e.g.*, James G. Hodge, Jr., & Lawrence O. Gostin, *School Vaccination Requirements: Historical, Social, and Legal Perspectives*, 90 Ky. L.J. 831, 844–49 (2002).  In 2015, when the California Legislature was considering whether to eliminate the exception for personal beliefs, the reigning controversy appeared to legislators to have sprung from stories about vaccines and autism, fears about the ingredients used in vaccines, and worries about the safety of administering many vaccines to young children.  Rep. Cal. Assem. Comm. on Health (SB 277) at 3.  The supporters of SB 277 concluded these concerns were unfounded.  *See id.* at 6–7.  It hypothesized their rise was attributable to "the rapid growth of the Internet and social media."  *Id.* at 3.  It emphasized that if vaccination rates declined, children could be at risk of contracting highly infectious diseases, such as measles, which can be deadly for very young children, *see id.* at 3, 5–6, and which "is one of the first diseases to reappear when vaccination coverage rates fall," *id.* at 5.

Many people and organizations objected to SB 277 before it came up for a vote.  The California Chiropractic Association, for example, argued the bill would amount to a "veto" of the "judgment of any physician who questions the status quo and believes that a patient should not receive a particular vaccine."  *Id.* at 11.  Many people also wrote letters to the legislature in opposition.  Some pointed out that children with disabilities had federal rights to a free, public education under the Individuals with Disabilities Education Act (IDEA), regardless of what vaccinations California might require.  *Id.* at 8, 11.  Others argued that if there is any risk of harm from a vaccine, parents should have a choice between that risk and the risk of forgoing vaccination.  *See id.* at 11.

The legislative history of SB 277 also memorializes discussions about whether courts would decide the bill ran afoul of the First Amendment or another part of the U.S. Constitution.  *See* Rep. Cal. Sen. J. Comm. (SB 277) at 7–18 (Apr. 27, 2015); Rep. Cal. Assem. Comm. on Health (SB 277) at 10 (June 11, 2015).  A judiciary committee's report cited the 1905 Supreme Court decision in *Jacobson*, in which the Court upheld a Massachusetts smallpox vaccination law.  Rep. Cal. Sen. J. Comm. (SB 277) at 9 (Apr. 27, 2015) (quoting *Jacobson v. Massachusetts*, 197 U.S. 11 (1905)).  The report quoted the Court's opinion, which held that states could rely on

4

1    their "police power" to pass "reasonable regulations" to "protect the public health and the public

2    safety." *Id.* (quoting *Jacobson*, 197 U.S. at 25).  The committee also relied on the Supreme

3    Court's 1990 decision in *Employment Division v. Smith*, which the committee interpreted as

4    creating a broad rule that "the free exercise clause cannot be used to challenge neutral laws of

5    general applicability." *Id.* at 16 (citing 494 U.S. 872 (1990), *overruled in part by statute on other*

6    *grounds as stated in Holt v. Hobbs*, 574 U.S. 352, 356–58 (2015)).  But the committee recognized

7    a court might instead require the state to cite both a "compelling" interest and to show the bill was

8    "narrowly tailored" to that interest under the balancing test normally described as "strict

9    scrutiny." *See id.* at 13, 17–18.  To that end, the committee specifically found "compelling" the

10    state's interest in ensuring "the school and community vaccination levels overall remain

11    sufficiently high," and it memorialized its conclusion that the bill was "narrowly tailored" to that

12    interest. *Id.* at 13.

13         In the end, SB 277 passed and received the Governor's approval, which meant California

14    students and their parents could no longer object to vaccination based on their personal beliefs,

15    but they could rely on at least four other exceptions.  First, as had been true before SB 277 was

16    passed, the law would not require children to be vaccinated if their medical condition made

17    vaccination unsafe.  *See* Cal. Health & Safety Code § 120372 (2016); *see also* 2019 Cal. Stat.

18    Ch. 278 (S.B. 276) (amending and tightening the medical exception).  Second, the law would not

19    prevent children from attending school if they were entitled to services laid out in an

20    individualized education program (IEP) under the federal Individuals with Disabilities Education

21    Act (IDEA).  *See id.* § 120335(h).  Third, children would not need to prove vaccination if they

22    would not receive instruction in a classroom, for example because they were attending home

23    school.  *Id.* § 120335(f).  And fourth, if the Department of Public Health added new vaccines to

24    the list of mandatory vaccines by taking administrative action, then the law would make a

25    personal-beliefs exception for those specific vaccines until the legislature enshrined the new

26    vaccines in the statute itself.  *See id.* § 120338.

27         In addition to these exceptions, and independently of SB 277, California permits children

28    in four categories—foster children, homeless children, children in military families, and migrant

5

1  children—to transfer to a new school on a temporary basis even if they do not have their

2  immunization records and other documents on hand.  The state initially made this allowance to

3  foster children in 2003, several years before the legislature passed SB 277.  *See* 2003 Cal. Stat.

4  Ch. 862 (A.B. 490).  The law allows an educational liaison for foster children to consult with a

5  foster child and the person holding the right to make educational decisions and decide what

6  school the foster child attends.  *See id.* § 4 (adding Cal. Educ. Code § 48853.5(c)).  If a transfer is

7  agreed upon, the "new school" is required to "immediately enroll the foster child even if the

8  foster child . . . is unable to produce records or clothing normally required for enrollment,"

9  including the medical records that show "proof of immunization history" required by the Health

10  Code provisions discussed above.  Cal. Educ. Code § 48853.5(f)(8)(B).

11      The state adopted a similar rule for "homeless children" in 2016.  *See* Cal. Educ. Code

12  § 48852.7; 2016 Cal. Stat. Ch. 289 (S.B. 445).  That statute ensures "the homeless child has the

13  benefit of matriculating with his or her peers in accordance with the established feeder patterns of

14  school districts," even if the student becomes homeless or finds housing in another district.  *Id.*

15  § 48852.7(c).  Homeless students "transitioning to a middle school or high school" must also be

16  allowed "to continue to the school designated for matriculation."  *Id.* § 4852.7(c)(2).  And in

17  either scenario, the new school must "immediately enroll the homeless child" even if the child

18  cannot produce all of the paperwork and other materials that might otherwise be required of new

19  students before they enroll, including immunization records.  *Id.* § 48852.7(c)(3).

20      Finally, in 2018 and 2019, the legislature adopted similar allowances for children in

21  military families and migrant families, respectively.  The statutes allow these students to

22  transition between school grade levels, including transitions between middle and high school, "in

23  the school district of origin or the same attendance area."  *Id.* §§ 48204.6(c)(1), 48204.7(c)(1).  In

24  both scenarios, the law makes clear the new school must "immediately enroll" the student even if

25  the child cannot provide all of the paperwork and other materials that might otherwise be required

26  of new students before they enroll, including immunization records.  *Id.* §§ 48204.6(c)(3),

27  48204.7(c)(3).

1          But foster children, homeless children, children in military families, and migrant children

2    cannot continue attending the new school indefinitely without producing immunization records.

3    If they cannot produce those records within thirty days, or if, as it turns out, the children are not

4    vaccinated and do not obtain immunizations by that deadline, then they cannot attend the school

5    in person.  *See* Cal. Code Regs. tit. 17, §§ 6035, 6040.

6          The plaintiffs in this action contend that without an exception for religious beliefs, the

7    state's vaccination laws effectively prohibit them and their families from freely exercising their

8    religious beliefs.  They are all parents of one or more school-aged children.  *See* Second Am.

9    Compl. ¶¶ 15, 23, 32.  Each parent has prayed, consulted the Bible, and participated in other

10   study and learning, and all have come to the conclusion they cannot vaccinate their children

11   without violating their firmly held religious convictions.  *See id.* ¶¶ 19, 28, 31.  The parents of the

12   first family, Amy and Steve Doescher, would like to enroll their school-aged child in a California

13   public school full time.  *See id.* ¶ 20.  Their child is currently attending a "charter school under

14   independent study guidelines" but only "two days a week in person."  *Id.* ¶ 15.  Danielle and

15   Kamron Jones also would like to enroll their four school-aged children in public school, and they

16   attempted to enroll in a local school district in 2024, but they were turned away because they

17   could not show proof of immunization.  *See id.* ¶¶ 24, 29.  Finally, Renee and Sean Patterson

18   have one child in public school now, and they fear they may soon be forced to remove him from

19   his school because he is not vaccinated.  *Id.* ¶ 33.

20         Plaintiffs initially filed this case in late 2023.  *See generally* Compl., ECF No. 1.  After

21   defendants moved to dismiss, the parties stipulated to an amendment of the complaint, *see* Stip. &

22   Order, ECF No. 19, and after the amendment, the court granted a renewed motion to dismiss for

23   lack of jurisdiction, Order (Nov. 18, 2024), ECF No. 33.  The court granted the six parents'

24   request for leave to amend to add allegations showing they had standing, but only for their claims

25   against the Director of the California Department of Public Health.  *Id.* at 5–6.  The operative

26   second amended complaint includes one claim against Director Pan in her official capacity under

27   42 U.S.C. § 1983 for violation of the First Amendment's Free Exercise Clause.  *See id.* ¶¶ 71–99.

28   Plaintiffs seek injunctive and declaratory relief.  *See id.* ¶¶ 100–09.  Director Pan now moves to

1    dismiss for lack of jurisdiction under Rule 12(b)(1) and for failure to state a claim under Rule

2    12(b)(6).  *See generally* Mot., ECF No. 38; Mem., ECF No. 38-1.  Plaintiffs oppose, *see generally*

3    Opp'n, ECF No. 39, and Director Pan has filed her reply, *see generally* Reply, ECF No. 42.

4           After briefing was complete, another California federal district court issued an order

5    dismissing a similar lawsuit, in which the plaintiffs, also a group of parents, challenged the same

6    California law under the First Amendment.  *See generally Royce v. Pan*, No. 23-02012, 2025 WL

7    834769 (S.D. Cal. Mar. 17, 2025), *appeal filed*, No. 25-2504 (9th Cir. Apr. 18, 2025).  This court

8    allowed the parties in this case to submit supplemental briefs addressing the court's decision in

9    *Royce*, which they have done.  *See generally* Pls.' Suppl. Br., ECF No. 48;[4] Def.'s Suppl. Br.,

10   ECF No. 47; Pls.' Suppl. Reply, ECF No. 51; Def.'s Suppl. Reply, ECF No. 50.

11          The court held a hearing on June 5, 2025.  Jonathon Nicol appeared for the six parents,

12   and Darin Wessel appeared for Director Pan.

13   **II.    JURISDICTION**

14          As a court of limited jurisdiction, the court begins, as it must, with jurisdiction and Rule

15   12(b)(1).  "A Rule 12(b)(1) jurisdictional attack may be facial or factual."  *Safe Air for Everyone*

16   *v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  Director Pan's motion is facial; she takes the

17   plaintiffs' allegations as they are and contends those allegations do not support this court's

18   exercise of jurisdiction.  *See* Mem. 6–7.  The court therefore confines its review to those

19   allegations, does not consider information from other sources and draws reasonable inferences in

20   favor of the six parents.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Ashcroft v.*

21   *Iqbal*, 556 U.S. 662, 678–79 (2009).

22          "Article III of the Constitution confines the jurisdiction of federal courts to 'Cases' and

23   'Controversies.'"  *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024)

24   (quoting U.S. Const. art. III, § 2).  The Supreme Court has interpreted that language as requiring

25   all plaintiffs to "demonstrate (i) that [they have] suffered or likely will suffer an injury in fact,

---

[4] Director Pan argues in her supplemental reply that the plaintiffs' supplemental brief exceeds the ten pages this court allowed.  *See* Def.'s Suppl. Reply at 1 & n.1  The brief in question is eleven pages long.  The eleventh page includes only a heading, one short sentence and a signature.  The court declines to impose any sanction.

1  (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury

2  likely would be redressed by the requested judicial relief."  Order (Nov. 18, 2024) at 4, ECF

3  No. 33 (alterations in previous order) (quoting *All. for Hippocratic Med.*, 602 U.S. at 380).  "The

4  alleged injury must be 'particularized' in the sense that it affects 'the plaintiff in a personal and

5  individual way and not be a generalized grievance.'"  *Id.* at 4–5 (quoting *All. for Hippocratic*

6  *Med.*, 602 U.S. at 381).  "When a plaintiff seeks prospective relief, as plaintiffs do in this case,

7  they must demonstrate the injury they fear is 'imminent' and 'certainly impending.'"  *Id.* at 5

8  (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).

9      Four of the plaintiff parents, Amy and Steve Doescher and Danielle and Kamron Jones,

10  allege the state's vaccination requirements have directly forced them personally to spend time and

11  money on independent study and homeschool programs they would not otherwise have spent—

12  and would not spend in the future—if their children attended public school.  *See* Second Am.

13  Compl. ¶¶ 17, 25–27.  With the protection of an injunction or judicial declaration from this court,

14  they allege they would enroll their children full-time in a public school.  *See id.* ¶¶ 20, 24, 26.

15  These allegations support the conclusion the Doeschers and Joneses have standing.

16      Director Pan contends otherwise.  In her view, the costs in question are "tangential" to

17  plaintiffs' religious beliefs and therefore "insufficient."  Mem. at 6.  She argues "claims based on

18  infringement of free exercise require injury to the free exercise itself," citing the Supreme Court's

19  decision in *McGowan v. Maryland*, 366 U.S. 420, 429 (1961), and a 2024 decision by the United

20  States District Court for the Western District of New York, *Miller v. McDonald*, 720 F. Supp. 3d

21  198, 208 (W.D.N.Y. 2024).[5]  *See* Mem. at 6.

22      The complaint in this case suffers from none of the jurisdictional faults that proved

23  decisive in *McGowan* and *Miller*.  In *McGowan*, seven employees at a department store had been

24  indicted for selling a variety of everyday home and office supplies in violation of Maryland's

25  "Sunday Closing Laws," which "generally proscribe[d] all labor, business and other commercial

---

[5] The Second Circuit affirmed the district court's order in *Miller*, but the appellants did not challenge the district court's jurisdictional analysis, and the Second Circuit did not address the jurisdictional dispute.  *See* 130 F.4th 258, 261 & n.5 (2d Cir. 2025) (per curiam).

1    activities on Sunday." 366 U.S. at 422.  At the Supreme Court, they argued among other things

2    that the laws violated "the constitutional guarantee of freedom of religion." *Id.* at 429.  Although

3    the employees alleged they had suffered "economic injury," they did not "allege any infringement

4    of their own religious freedoms," or of the "beliefs of the department store's present or

5    prospective patrons." *Id.*  The record was "silent" as to what the employees' religious beliefs

6    were. *Id.*  Because they could not assert the rights of some other, unidentified person, the

7    Supreme Court rejected their free exercise claim. *See id.* at 429–30.  In this case, by contrast, the

8    Doeschers and Joneses allege their own religious beliefs are what lead them not to vaccinate their

9    children; they are not relying on beliefs in the abstract or on beliefs held by others.  Their

10   complaint also clearly lays out the connections between their beliefs, their alleged injuries and the

11   state's immunization requirements, as summarized above.

12        In *Miller*, the court focused on the defendants' authority and connections to the disputed

13   statute.  Like the parents in this case, the plaintiffs in *Miller* alleged a New York vaccination

14   requirement deprived them of their First Amendment rights in violation of the Free Exercise

15   Clause. 720 F. Supp. 3d at 202.  And like California, New York does not permit children to

16   attend school if they are not vaccinated against a variety of diseases; nor does New York make an

17   exemption for personal beliefs. *See id.* at 203–04.  The plaintiffs sued the state's commissioners

18   of both health and education. *Id.* at 202.  The parties and the court agreed the plaintiffs could

19   pursue claims against the health commissioner. *See id.* at 208.  But the court found the plaintiffs

20   had no standing to pursue claims against the commissioner of education. *See id.* at 207–08.  The

21   complaint included no allegations to show the commissioner of education "ha[d] played or will

22   play in the future any role in the actions of which [the plaintiffs] complained." *Id.* at 208.  The

23   allegations against her were based on unfounded speculation and actions by other third parties.

24   *See id.*  For these reasons, an injunction against the commissioner of education "would not redress

25   their alleged injury," so there was no case or controversy between her and the plaintiffs, and the

26   plaintiffs' claims against the commissioner of education were dismissed. *Id.*  Director Pan, by

27   contrast, has authority to adopt and enforce regulations implementing the state's vaccination

28   requirements for school-aged children and is the proper defendant under the Supreme Court's

1   decision in *Ex Parte Young*. *See* Cal. Health & Safety Code § 120330; Second Am. Compl. ¶ 40;

2   Order (Nov. 18, 2024), at 3–4 (citing 209 U.S. 123 (1908)). For these reasons, the Doeschers'

3   and the Joneses' allegations permit the court to infer they have standing to assert First

4   Amendment claims.

5       The third couple, the Pattersons, rely on a different theory than the Doeschers and Joneses.

6   Unlike the Doeschers' and Joneses' children, the Pattersons' son is currently enrolled in a public

7   school full time "where vaccinations are mandatory." *Id.* ¶ 32. And so, unlike the Doeschers and

8   Joneses, the Pattersons do not allege they have been forced to spend time or money to replace a

9   public education. They allege they and their son have been subjected to different harms.

10      One of these harms has taken the form of "hurtful comments" by "[m]embers of the

11  public" about the Pattersons' decisions and beliefs, leading to "social stigma and exclusion." *Id.*

12  ¶ 35. But their complaint does not describe those hurtful comments or connect them to Pan or

13  other state officials or policies, as was true of plaintiffs' previous complaint. *See* Order (Nov. 18,

14  2024) at 5–6. It is possible there is some connection, but "[a]t this stage, possibilities alone do

15  not suffice." *Id.* at 6 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007) and *Lujan*,

16  504 U.S. at 561). The Pattersons' allegations about hurtful comments do not show there is a

17  "case" or "controversy" between themselves and Pan that this court can adjudicate.

18      Nor can the Pattersons show they have standing by alleging they have been subjected to

19  social stigma. As the Supreme Court has made clear, a plaintiff cannot allege simply that the

20  government has run afoul of the Constitution, even if, by doing so, the government's actions have

21  cast upon them a shadow of social stigma. *See All. for Hippocratic Med.*, 602 U.S. at 381–82;

22  *Allen v. Wright*, 468 U.S. 737, 754–55 (1984). The Pattersons must allege they have suffered a

23  concrete injury or harm, or they must offer plausible factual allegations that permit the court to

24  infer such an injury or harm is "imminent" and "certainly impending." *Clapper*, 568 U.S. at 409

25  (emphasis, citations and quotation marks omitted).

26      Beyond the hurtful public comments, however, the Pattersons also believe the state or

27  school district will soon enforce its school vaccination requirements, which would mean their son

28  would "be forced to change where he attends school," leading their family to worry about

11

"changing social groups, leaving teams and clubs," and other similar disruptions. Second Am. Compl. ¶ 33. The Pattersons also worry about "negative, stressful, and disruptive effects" if their son is suddenly "disenrolled without warning." *Id.* ¶ 34. These allegations focus on the hardships their son would suffer if the state ultimately enforced its vaccination requirements, such as his losses of friendships and the end of his memberships in school teams and clubs, as was true of the allegations in the complaint's previous iteration. *See* Order (Nov. 18, 2024) at 5–6. And as before, it is unclear whether the Pattersons mean to pursue claims on their son's behalf. It is possible they could rely on a theory of third-party standing or act as their son's representatives, because he is a minor. *See, e.g.*, Fed. R. Civ. P. 17(c)(1)(A) (providing a "general guardian" may "sue or defend on behalf of a minor"); *Callahan v. Woods*, 658 F.2d 679, 682 & n.2 (9th Cir. 1981) (holding a father could "preserve" his daughter's religious freedom by asserting a religious objection on her behalf, "even though she may well decide later" to abandon that belief). But they do not advance arguments along these lines in their opposition, their complaint does not name their son as a plaintiff, they have not sought to be appointed as his representatives in this action, and at hearing, their counsel agreed they are not pursuing claims in this type of representative capacity.

Instead, the Pattersons rely on a theory of their own rights as parents, citing the Supreme Court's decision in *Wisconsin v. Yoder*. *See* Opp'n at 2–3 (citing 406 U.S. 205 (1972)). In *Yoder*, the state had "charged, tried, and convicted" several parents for violating compulsory school attendance laws after they withdrew their children from public school. 406 U.S. at 207–08. The state had penalized them directly, not their children, so there undeniably was a "case" to adjudicate. The Supreme Court also made clear the parents' rights and injuries—rather than those of the children—were its focus. "It is the parents who are subject to prosecution here for failing to cause their children to attend school," it wrote, "and it is their right of free exercise, not that of their children, that must determine Wisconsin's power to impose criminal penalties on the parent." *Id.* at 230–31. Although the Supreme Court's opinion in *Yoder* leaves no doubt parents have a right "to direct the religious upbringing of their children," *id.* at 233, the Court did not consider or decide in *Yoder* what types of past or future injuries or harms can support a parent's

1    standing to assert a claim based on a deprivation of this parental right.  From *Yoder* we know only

2    that a prosecution, trial and conviction would suffice.

3         If California had prosecuted the Pattersons for refusing to vaccinate their children, then

4    this case would be comparable to *Yoder*.  The same would likely be true if the Pattersons had not

5    been convicted, but they faced a credible threat of prosecution.  *See Babbitt v. United Farm*

6    *Workers Nat. Union*, 442 U.S. 289, 298–99 (1979).  But the Pattersons are not challenging a

7    conviction or a fine, and they do not allege they are personally at risk of prosecution, as

8    confirmed at hearing.  Their jurisdictional theory is less direct: "Religious exemptions to

9    vaccinations in the school context," they allege, "are based on a *parent's* religious beliefs because

10   *parents* decide the religious habits of their children."  Second Am. Compl. ¶ 10 (emphases in

11   original) (citing 406 U.S. at 233).  They also allege a "public education" is a "government

12   benefit" to the parents themselves.  *Id.* ¶ 13.  In sum, the Pattersons' primary theory of standing is

13   that the state's vaccine law may soon deprive them of an important benefit or right[6] based on their

14   decisions about their son's religious upbringing.  In terms of this court's jurisdiction, the

15   Pattersons have standing only if their complaint permits this court to reach two conclusions about

16   their claims: first, Director Pan or someone acting under her direction will imminently require the

17   Pattersons to choose between showing proof of the required immunizations and making other

18   educational arrangements for their son; and second, this will cause harm to Renee and Sean

19   Patterson in a concrete and personal way.

20        The second of these conclusions is easier to reach than the first.  Although the Pattersons'

21   complaint does not include specific allegations illustrating the concrete harms they would suffer if

22   they were forced to find other educational arrangements for their son, they do allege he would

23   need to find his way to a new social circle, and new sports teams and clubs, as summarized above.

24   *See* Second Am. Compl. ¶¶ 32–34.  With the benefit of a few favorable and reasonable

25   inferences, which the court must draw at this early stage, *see Iqbal*, 556 U.S. at 678–79, it is

---

[6] *See Plyler v. Doe*, 457 U.S. 202, 221 (1982) ("Public education is not a 'right' granted to individuals by the Constitution.  But neither is it merely some governmental 'benefit' indistinguishable from other forms of social welfare legislation." (citation omitted)).

13

plausible the Pattersons, like the Doeschers and Joneses, would need to spend time and money to ensure their son has the educational and social advantages he now enjoys at his public school if he could no longer attend there.

By contrast, it is more difficult to say when, how quickly, in what form, and even whether an enforcement action is actually coming. Uncertainties about future enforcement actions are a "recurring issue" in federal courts. *Tingley v. Ferguson*, 47 F.4th 1055, 1067 (9th Cir. 2022) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). The Supreme Court has "permitted pre-enforcement review under circumstances that render the threatened enforcement sufficiently imminent." *Driehaus*, 573 U.S. at 159. More specifically, plaintiffs must allege they have "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," and there must be "a credible threat" of enforcement. *Id.* (quoting *Babbitt*, 442 U.S. at 298). On this final point—a "credible threat of enforcement"—the Ninth Circuit has instructed district courts to consider three factors: "(1) whether the plaintiff has a 'concrete plan' to violate the law, (2) whether the enforcement authorities have 'communicated a specific warning or threat to initiate proceedings,' and (3) whether there is a 'history of past prosecution or enforcement.'" *Tingley*, 47 F.3d at 1067 (quoting *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc)). "'Neither the mere existence of a proscriptive statute nor a generalized threat of prosecution' satisfies this test." *Id.* (quoting *Thomas*, 220 F.3d at 1139).

The Pattersons allege they intend to engage—and in fact already are engaged—in a course of conduct at odds with the state's vaccination laws: they have enrolled their child in public school without proof of his immunization. Second Am. Compl. ¶ 32. Their conduct also at least arguably implicates a constitutional interest based on their religious beliefs about vaccines. *See id.* ¶ 31. But the Pattersons do not allege any state or local authorities have warned them their son must offer proof of immunization, as plaintiffs in other cases have alleged. *See, e.g.*, First Am. Compl. ¶¶ 11, 14–18, 25, *Whitlow v. Dep't of Ed.*, No. 16-1715 (July 14, 2016), ECF No. 11; *Masseth v. Jones*, No. 21-1408, 2021 WL 6752317, at *2 (C.D. Cal. Nov. 9, 2021). They allege only that state and school district officials have issued general warnings, which they describe as

14

1    "missives."  Second Am. Compl. ¶ 33.  At hearing, the Pattersons' counsel did not identify any

2    specific warnings in response to the court's questions.

3           The Ninth Circuit has interpreted a state's "failure to disavow enforcement of the law as

4    weighing in favor of standing."  *Tingley*, 47 F.4th at 1068 (emphasis omitted) (citing *Cal.*

5    *Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021)).  The court asked Director Pan's

6    counsel at hearing whether the director would disavow enforcement of SB 277.  Counsel did not

7    expressly disavow enforcement on the Director's behalf.  He did state unambiguously, however,

8    that the Department of Health does not have authority to enforce SB 277 against any particular

9    student, but rather only to issue guidance and help to educate schools and the public about

10   vaccines and vaccination requirements.  Counsel's assertion contradicts statements defendants

11   have made previously in this case.  *See* Defs.' Mem. P. & A. at 7, ECF No. 21 (arguing "the

12   statute expressly confers" enforcement authority "to the California Department of Public Health,"

13   citing Cal. Health & Safety Code § 120330).  The assertion also appears to be in direct

14   contradiction to the state's Health and Safety Code, which expressly grants the Department of

15   Public Health authority "to adopt and enforce all regulations necessary to carry out" several

16   statutory provisions, including the vaccination requirements in section 120338, "in consultation

17   with the Department of Education."  Cal. Health & Safety Code § 120330.  The court therefore

18   construes counsel's statement as an assurance that Director Pan does not intend to exercise any

19   authority she has to enforce SB 277 against any particular student, including any of the plaintiffs'

20   children in this case.

21          Director Pan's counsel also relayed his understanding that the Pattersons' son is a high

22   school senior who will likely soon graduate if he has not already, suggesting similarly there is no

23   imminent threat of enforcement.  Additionally, the state's Health and Safety Code similarly

24   implies a local enforcement effort is unlikely.  Under section 120335, "the governing authority

25   shall not unconditionally admit to any [covered school or other institution] or admit or advance

26   any pupil to 7th grade level, unless the pupil has been immunized for his or her age as required."

27   Cal. Health & Safety Code § 120335(g)(3).  That is, it does not appear the statute requires local

28   high schools to check their students' immunization records after students have matriculated.

15

1    Nor do the Pattersons allege state or local authorities have a history of barring students

2    from continuing to attend the schools where they are enrolled.  They cite no cases of past

3    enforcement.  In fact, they allege the state has enforced its vaccination requirements

4    inconsistently, and they allege some California school districts are untroubled by missing

5    vaccination records.  *See* Second Am. Compl. ¶¶ 51–52.  In cases about "relatively new" laws,

6    the absence of any enforcement history might be only a minor concern, *Tingley*, 47 F.4th at 1069

7    (quoting *Cal. Trucking*, 996 F.3d at 653), but this is not a case about a new law.  California has

8    required students to be vaccinated for more than a hundred years.  Its modern vaccination statute

9    was passed originally in the 1960s.  More than a decade has passed since the legislature

10    eliminated the exception for personal beliefs by passing SB 277.

11    In sum, although the Pattersons currently are engaged in conduct at odds with the vaccine

12    statutes they challenge, and although that conduct implicates a constitutional interest based on

13    their religious beliefs about vaccines, it is unlikely an enforcement action is imminent: (1) unlike

14    other plaintiffs who have made similar claims in the past, the Pattersons have not identified any

15    specific warning about a potential enforcement action, (2) the terms of the state Health and Safety

16    Code imply an enforcement action is unlikely, (3) no allegations and no other information in the

17    record shows California state or local authorities have a history of enforcing the state's

18    immunization requirements against students in the same situation as the Pattersons' son, and

19    (4) the attorney representing the only defendant in this action, Director Pan, stated in open court

20    that she does not intend to exercise any authority she has to enforce the state's vaccination

21    requirements against the Pattersons or their son in particular.

22    For these reasons, the Doeschers and Joneses have standing to assert their First

23    Amendment claims, but the Pattersons do not.[7]

---

    [7] Although the court cannot exclude the possibility the Pattersons could amend or
supplement their complaint to allege facts about an imminent enforcement effort, the court
declines to permit such an amendment or supplement.  As explained in the next section, it would
be futile to permit further amendments in support of the other parents' constitutional claims.  The
court therefore declines to permit the Pattersons an opportunity to make additional jurisdictional
allegations as well.

1    **III.    FIRST AMENDMENT**

2         On the merits, Director Pan argues the complaint does not "state a claim upon which relief

3    can be granted" under Federal Rule of Civil Procedure 12(b)(6).  In response to that argument, the

4    court begins by assuming the allegations in the operative second amended complaint are true, but

5    not its legal conclusions.  *Iqbal*, 556 U.S. at 678–79 (citing *Twombly*, 550 U.S. at 555).  The court

6    then determines whether those factual allegations "plausibly give rise to an entitlement to relief"

7    under Rule 8.  *Id.* at 679.

8         As a threshold matter, Director Pan argues it is unclear whether the six parents' decisions

9    were a matter of their religious beliefs rather than their philosophical or other secular beliefs.  *See*

10    Mem. at 10.  It is true a claim must be "rooted in religious belief" if it is "to have the protection of

11    the Religion Clauses." *Yoder*, 406 U.S. at 215.  Although it may be a "delicate question" for a

12    court to answer, the answer is tied up with "the very concept of ordered liberty." *Id.* at 215–16.

13    The Constitution does not permit "every person to make his own standards on matters of conduct

14    in which society as a whole has important interests." *Id.*  In *Hanzel v. Arter*, for example, the

15    plaintiffs objected to vaccines "on the basis of their belief in 'chiropractic ethics,' a body of

16    thought which teaches that injection of foreign substances into the body is of no benefit and can

17    only be harmful." 625 F. Supp. 1259, 1260 (S.D. Ohio 1985).  This meant they could not rely on

18    the First Amendment's religion clauses. *Id.* at 1265.  But the complaint in this case connects the

19    parents' actions to their Christian beliefs, prayers and Bible study without ambiguity.  *See* Second

20    Am. Compl. ¶¶ 19, 29.  The Doeschers and Joneses may invoke the First Amendment's Free

21    Exercise Clause.

22         Although the complaint ties the parents' vaccination decisions to a constitutional

23    protection, it does not lay out a plausible legal theory.  Courts at every level have confronted

24    similar disputes many times before.  From the beginning, these challenges have fallen short,

25    almost universally.  This case is no different.

26         **A.    Courts repeatedly have upheld similar laws since the nineteenth century.**

27         In California, constitutional litigation about vaccination laws began soon after the state

28    passed its first compulsory child vaccination requirement for school attendance in 1888.  Hodge

1    & Gostin, *supra*, at 851.  The earliest legal challenges were not about the rights of those with

2    specific religious convictions.  At the time the first legal challenges were filed, the United States

3    Supreme Court had not yet interpreted the First Amendment as imposing limits on what state and

4    local governments can do; the amendment applied then only to the national government.  *See*

5    *Cantwell v. State of Connecticut*, 310 U.S. 296, 303 & n.3 (1940) (citing *Schneider v. State of*

6    *New Jersey, Town of Irvington*, 308 U.S. 147, 159 (1939)).  Most of the earliest vaccine disputes

7    focused instead on state "police powers" and the Equal Protection Clause of the Fourteenth

8    Amendment, which binds states expressly.  *See* U.S. Const. amend. XIV § 1 ("No State shall . . .

9    deny to any person within its jurisdiction the equal protection of the laws.").  These early cases

10   are instructive nonetheless.

11           In the first reported opinion about a California vaccination law, issued in 1890, the

12   California Supreme Court was unwilling to second guess the state legislature's judgment about

13   "[w]hat is for the public good."  *Abeel*, 84 Cal. at 230.  In 1904, the state supreme court reiterated

14   that conclusion.  *See generally French v. Davidson*, 143 Cal. 658 (1904).  Legislators "were of

15   the opinion that the proper place to commence in the attempt to prevent the spread of a contagion

16   was among the young, where they were kept together in considerable numbers in the same room

17   for long hours each day."  *Id.* at 662.  "It needs no argument to show that, when it comes to

18   preventing the spread of contagious diseases, children attending school occupy a natural class by

19   themselves, more liable to contagion, perhaps, than any other class that we can think of."  *Id.*  The

20   court had no difficulty rejecting the plaintiff's argument.  Neither the Fourteenth Amendment nor

21   "any other part of the federal Constitution interfere[s] with the power of the state to prescribe

22   regulations to promote the health and general welfare of the people," it wrote.  *Id.*  The court

23   recognized that individuals may sometimes need to make sacrifices for the general good: "Special

24   burdens are often necessary for general benefits."  *Id.* at 662 (quoting *Barbier v. Connolly*,

25   113 U.S. 27 (1884)).

26           The United States Supreme Court took up the issue the very next year, in *Jacobson*, the

27   case cited by the California legislature when it was deciding whether to pass SB 277.  *See*

28   *generally* 197 U.S. 11.  Like the California Supreme Court had done before, the U.S. Supreme

18

1   Court focused on "the police power" in *Jacobson*, and it underscored the states' long-recognized

2   authority "to enact quarantine laws and 'health laws of every description,'" which went back to

3   the early nineteenth century at least. *Id.* at 25 (quoting *Gibbons v. Ogden*, 22 U.S. 1, 203 (1824)).

4   The Court described vaccination laws as one of the "reasonable regulations" states may pass to

5   "protect the public health and the public safety." *Id.*

6       The Supreme Court also recognized a state's efforts to protect public health and safety

7   might intrude on the preferences of an individual person. But it rejected the defendant's

8   argument "that his liberty [was] invaded when the state subject[ed] him to fine or imprisonment

9   for neglecting or refusing to submit to vaccination." *Id.* at 25. "[T]he liberty secured by the

10  Constitution of the United States to every person within its jurisdiction does not import an

11  absolute right in each person to be, at all times and in all circumstances, wholly freed from

12  restraint." *Id.* at 26. "Society based on the rule that each one is a law unto himself would soon be

13  confronted with disorder and anarchy." *Id.* at 25–26 (citations and quotation marks omitted).

14  The Court was "not prepared to hold that a minority, residing or remaining in any city or town

15  where smallpox is prevalent, and enjoying the general protection afforded by an organized local

16  government, may thus defy the will of its constituted authorities, acting in good faith for all,

17  under the legislative sanction of the state." *Id.* at 37.

18      The story was the same a few years later in *Zucht v. King*, 260 U.S. 174 (1922). A local

19  ordinance in San Antonio, Texas provided then "that no child or other person shall attend a public

20  school or other place of education without having first presented a certificate of vaccination." *Id.*

21  at 175. Officials had excluded the plaintiff, a school-aged girl, from both public and private

22  school because she could not show she was vaccinated, and she "refused to submit to

23  vaccination." *Id.* The U.S. Supreme Court held the issue was "settled." *Id.* at 176. "[A] state

24  may, consistently with the federal Constitution, delegate to a municipality authority to determine

25  under what conditions health regulations shall become operative." *Id.* The municipality could

26  then "vest in its officials broad discretion in matters affecting the application and enforcement of

27  a health law," and local officials could "freely" make "reasonable classification[s]" without

28  violating the Equal Protection Clause. *Id.* at 176–77.

1       In the 1940s, after the Supreme Court held in *Cantwell* that states, like the federal

2   government, are bound by the First Amendment's religion clauses, it signaled it would likely

3   reject a religious rights challenge to a state immunization law.  The issue arose in *Prince v.*

4   *Massachusetts*, 321 U.S. 158 (1944), which was not about vaccines.  The petitioner, a member of

5   the Jehovah's Witnesses, had been convicted of violating a child labor prohibition.  *See id.* at 161.

6   At the Supreme Court, she contended she had simply been following the dictates of her faith

7   when she had tasked her nine-year-old niece with selling religious magazines.  *See id.* at 162–63.

8   This violated Massachusetts child labor laws.  *See id.*  The Supreme Court rejected her claims, but

9   it did not limit its reasoning to child labor laws.  "Acting to guard the general interest in youth's

10  well being," it wrote, "the state as *parens patriae* may restrict the parent's control by requiring

11  school attendance, regulating or prohibiting the child's labor, and in many other ways."  *Id.* at 166

12  (footnotes omitted).  "[The state's] authority is not nullified merely because the parent grounds

13  his claim to control the child's course of conduct on religion or conscience."  *Id.*  "Thus," the

14  Court explained, citing its decision in *Jacobson*, a parent "cannot claim freedom from compulsory

15  vaccination for the child more than for himself on religious grounds."  *Id.* (citing 197 U.S. 11).

16  "The right to practice religion freely does not include liberty to expose the community or the

17  child to communicable disease or the latter to ill health or death."  *Id.* at 166–67.

18      Although these statements were dicta in that they were not strictly necessary to the

19  Supreme Court's holding, they were reasoned and unequivocal, and "Supreme Court dicta is not

20  to be lightly disregarded."  *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1090 n.8 (9th Cir.

21  2003).  After *Prince* was decided, lower courts regularly rejected religious challenges to

22  compulsory vaccination laws.  In 1964, for example, the Supreme Court of Arkansas wrote that

23  "the great weight of authority" had confirmed "it is within the police power of the State to require

24  that school children be vaccinated against smallpox, and that such requirement does not violate

25  the constitutional rights of anyone, on religious grounds or otherwise."  *Cude v. State*, 237 Ark.

26  927, 932 (1964).  That conclusion was "so firmly settled that no extensive discussion [was]

27  required."  *Id.*  A New York federal district court reached essentially the same conclusion in the

28  1980s: "[I]t has been settled law for many years that claims of religious freedom must give way in

1  the face of the compelling interest of society in fighting the spread of contagious diseases through

2  mandatory inoculation programs." *Sherr v. Northport-E. Northport Union Free Sch. Dist.*,

3  672 F. Supp. 81, 88 (E.D.N.Y. 1987).

4      In the 1990s, the Supreme Court revisited application of the Free Exercise Clause in two

5  foundational opinions.  In *Employment Division v. Smith*, the Court held "the right of free

6  exercise does not relieve an individual of the obligation to comply with a valid and neutral law of

7  general applicability on the ground that the law proscribes (or prescribes) conduct that his religion

8  prescribes (or proscribes)."  494 U.S. at 879 (citation omitted).  And in *Church of Lukumi Babalu*

9  *Aye, Inc. v. City of Hialeah*, the Court wrote more about what it means for a law to be neutral and

10  generally applicable.  *See generally* 508 U.S. 520 (1993).  First, "[t]he Free Exercise Clause

11  protects against governmental hostility which is masked, as well as overt."  *Id.* at 543.  For that

12  reason, "[o]fficial action that targets religious conduct for distinctive treatment cannot be shielded

13  by mere compliance with the requirement of facial neutrality.  "  *Id.*  Second, although "[a]ll laws

14  are selective to some extent . . . categories of selection are of paramount concern when a law has

15  the incidental effect of burdening religious practice."  *Id.* at 542.  A reviewing court therefore

16  must assure itself that the challenged law is not substantially "underinclusive" in achieving the

17  purposes the government identifies.  *See id.* at 543.

18      After *Smith* and *Lukumi*, lower federal courts continued to uphold school vaccine

19  requirements.  The two most frequently cited opinions are likely the Fourth and Second Circuits'

20  decisions in *Phillips v. City of New York*, 775 F.3d 538, 543 (2d Cir. 2015) (per curiam) and

21  *Workman v. Mingo County Board of Education*, 419 F. App'x 348, 353–54 (4th Cir. 2011)

22  (unpublished).  The two circuit courts rejected the challengers' arguments categorically:

23  "mandatory vaccination as a condition for admission to school does not violate the Free Exercise

24  Clause," the Second Circuit wrote, citing the Fourth.  *Phillips*, 775 F.3d at 543 (citing *Workman*,

25  419 F. App'x at 353–54).  The Supreme Court denied the plaintiffs' petitions for certiorari in both

26  cases.  *See generally* 136 S. Ct. 104 (2015); 132 S. Ct. 590 (2011).

27      The same statute plaintiffs challenge now, SB 277, was itself upheld after *Smith* and

28  *Lukumi* were decided.  First, in *Whitlow v. California*, a group of seventeen parents and children

1   and four nonprofit corporations alleged SB 277 violated the First Amendment's Free Exercise

2   Clause, and they asked the district court to issue a preliminary injunction. *See* 203 F. Supp. 3d

3   1079, 1081–82 (S.D. Cal. 2016). The district court followed the Fourth and Second circuits and

4   held "the right to free exercise does not outweigh the State's interest in public health and safety."

5   *Id.* at 1086 (citing *Prince*, 321 U.S. 158, *Phillips*, 775 F.3d 538, and *Workman*, 419 F. App'x at

6   356). The district court denied the motion for a preliminary injunction, and the plaintiffs later

7   dismissed their claims voluntarily. *See* Not. Voluntary Dismissal, *Whitlow v. California*,

8   No. 16-1715 (S.D. Cal. Aug. 31, 2016), ECF No. 44. The California Court of Appeal twice

9   rejected very similar claims about two years later, relying as did the district court on the cases

10  summarized above. *See generally Love v. State Dep't of Educ.*, 29 Cal. App. 5th 980 (2018);

11  *Brown*, 24 Cal. App. 5th 1135.

12       Then came the COVID-19 pandemic. California, like many other states, imposed wide-

13  ranging and strict limits on public and private gatherings in an attempt to prevent the spread of the

14  virus, including limits on religious gatherings. These restrictions, both in California and

15  elsewhere, prompted many challenges rooted in the First Amendment's Free Exercise Clause, and

16  several of those challenges reached the United States Supreme Court, which granted a number of

17  the challengers' emergency applications for injunctions. *See generally, e.g.*, *Tandon v. Newsom*,

18  593 U.S. 61 (2021) (per curiam); *S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716

19  (2021); *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14 (2020) (per curiam). In *Tandon*

20  *v. Newsom*, the Supreme Court wrote that its decisions in these emergency matters had made

21  several points clear. 593 U.S. at 62. Two are relevant here. "First, government regulations are

22  not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise

23  Clause, whenever they treat any comparable secular activity more favorably than religious

24  exercise." *Id.* at 62. "Second, whether two activities are comparable for purposes of the Free

25  Exercise Clause must be judged against the asserted government interest that justifies the

26  regulation at issue." *Id.*

27       These holdings "arguably represented a seismic shift in Free Exercise law." *Calvary*

28  *Chapel Dayton Valley v. Sisolak*, 982 F.3d 1228, 1232 (9th Cir. 2020). They prompted a rise in

1    free exercise challenges against school vaccination requirements. But as before, these challenges

2    have almost all failed. In 2023, for example, the Second Circuit rejected a challenge to

3    Connecticut's school vaccine requirement, which, like California's requirement, makes no

4    exception specifically for those with contrary religious beliefs. *See generally We The Patriots*

5    *USA, Inc. v. Conn. Off. of Early Childhood Dev.*, 76 F.4th 130 (2d Cir. 2023), *cert. denied*,

6    144 S. Ct. 2682 (2024). The court found the Connecticut law constitutional because it was

7    neutral, generally applicable and rationally related to a legitimate government interest. *See*

8    *generally id.* The Second Circuit relied not only on the Supreme Court's twentieth-century

9    decisions, such as *Jacobson*, *Zucht* and *Prince*, but also the Court's more recent opinions and

10   orders, including the pandemic-era decisions summarized above. *See id.* at 144–47 (citing *Fulton*

11   *v. City of Philadelphia*, 593 U.S. 522 (2021); *Tandon*, 593 U.S. 61; *Roman Catholic Diocese of*

12   *Brooklyn*, 592 U.S. 14; and *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617 (2018)).

13   And as reflected in the citation above, the Supreme Court did not grant certiorari.

14        Courts have reached the same conclusion in many other similar cases, including within the

15   Ninth Circuit, and in no case has the Supreme Court granted certiorari or issued a stay or

16   injunction. *See generally, e.g.*, *Miller*, 130 F.4th at 258; *Does v. Mills*, 16 F.4th 20 (1st Cir.),

17   *application for injunctive relief denied*, 142 S. Ct. 17 (2021), *and cert. denied*, 142 S. Ct. 1112

18   (2022); *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173 (9th Cir. 2021), *application for*

19   *injunctive relief denied*, 142 S. Ct. 1099 (2022). In fact, SB 277 itself again recently withstood a

20   post-pandemic constitutional challenge in *Royce*, 2025 WL 834769. In that case, the district court

21   explained in a thorough, detailed and persuasive order why California's modern vaccination law

22   is neutral, generally applicable and rationally related to a legitimate government interest. *See id.*

23   at *6–14.

24        **B.    The result is the same in this case.**

25        Now, as before, and like many other school vaccination requirements that have faced legal

26   challenges over the years, SB 277 is constitutional. The analysis boils down to three questions.

27   First, is the law neutral toward religion? *See Lukumi*, 508 U.S. at 531. Second, is the law

28   generally applicable? *See Fulton*, 593 U.S. at 533. And third, is the law rationally related to a

1   legitimate governmental purpose?  *See Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1084 (9th Cir.

2   2015).  If the answer to all three questions is "yes," then SB 277 does not violate the Free

3   Exercise clause.  With all that has been written in the many persuasive decisions and opinions

4   cited above, the court provides only a brief discussion below, as necessary for a clear record.

5          First, California's school vaccination law is neutral toward religion.  It makes no

6   distinctions on the basis of religion, there are no signs of artful drafting, and its legislative history

7   suggests no religious animus or covert targeting of religious beliefs.  *See Royce*, 2025 WL

8   834769, at *5–7; *Whitlow*, 203 F. Supp. 3d 1086–87; *Brown*, 24 Cal. App. 5th at 1144–45.  In

9   passing SB 277, legislators cited the importance of very high vaccination rates and "herd"

10  immunity, recent trends in falling vaccination rates, pockets of especially low rates and their

11  perception that the broad exception for personal beliefs—not religious beliefs—was one cause

12  behind those declines.  Legislators expressly recognized SB 277 would eliminate an exception for

13  religious beliefs by eliminating the broader exception for personal beliefs, as summarized in the

14  background section above.  But nothing in the committee reports shows lawmakers were singling

15  religion out; rather, by discussing constitutional rights and the First Amendment, legislators

16  sought to assure themselves they would not be passing an unconstitutional law.  *See We The*

17  *People*, 76 F.4th at 149–50 (rejecting similar claim for these reasons).  Legislators received and

18  weighed religious and secular objections alike from many individual people and groups.  They

19  further exhibited "solicitude for the concerns of religious objectors" by preserving a broad

20  personal beliefs exception for any new vaccines the state health authorities might add in the

21  future.  *Id.* at 149.  In this way, California's actions contrast markedly with the actions of the local

22  governments in cases like *Masterpiece Cakeshop* and *Lukumi*.  *See* 584 U.S. at 634–36 (finding

23  law not neutral based in part on intolerant and biased comments in enforcement hearing);

24  508 U.S. at 536 (finding law not neutral based in part on artful drafting).

25          Second, California's vaccine rules are generally applicable.  *See Royce*, 2025 WL 834769,

26  at *7–13; *Whitlow*, 203 F. Supp. 3d 1086–87; *Brown*, 24 Cal. App. 5th at 1144–45.  The law does

27  make exceptions, but those exceptions are not discretionary, they are not comparable to the

28  religious exception plaintiffs request, and they do not undermine the state's interests in public

1  health and safety as a religious or personal beliefs exception would.  *See Royce*, 2025 WL

2  834769, at *7–13.

3       Third, California has a legitimate interest in protecting the public health and safety by

4  increasing the number of vaccinated students in the schools within its borders.  *See Royce*, 2025

5  WL 834769, at *13–14; *Whitlow*, 203 F. Supp. 3d 1086–87; *Brown*, 24 Cal. App. 5th at 1145.

6       For these reasons, SB 277 does not violate the Free Exercise Clause.

7       **C.    The parents' contrary arguments are not persuasive.**

8       The Doeschers and Joneses dispute this conclusion, first because SB 277 is not generally

9  applicable in their view.  They begin with the medical exception.  *See* Opp'n at 13–14.  They

10  contend that exception allows state officers to make individualized and ad hoc discretionary

11  decisions.  *See id.* (citing *Fulton*, 593 U.S. 522).  The statute's terms show otherwise.  The

12  medical exception is available to those whose physician or surgeon explains "the medical basis

13  for which the exemption for each individual immunization is sought" and certifies "the physician

14  and surgeon has conducted a physical examination and evaluation of the child consistent with the

15  relevant standard of care and complied with all applicable requirements of this section," among

16  multiple other specific requirements.  Cal. Health & Safety Code § 120372(a)(2)(C), (F).  The

17  statute specifies who will review these submissions, how, and against what criteria and medical

18  guidelines they will be judged.  *See id.* § 120372(d).  The only "discretion" the statute recognizes

19  is "the medical discretion of the clinically trained immunization staff" to recognize

20  "contraindications or precautions" based on "written documentation" by a surgeon or doctor.  *Id.*

21  § 120372(d)(3)(B).  Multiple federal courts of appeals, including the Ninth Circuit, have held

22  these types of objective, professional requirements do not grant a discretion of the type that can

23  show a law is not generally applicable.  *See, e.g.*, *We The Patriots*, 76 F.4th at 150–51; *We The*

24  *Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 289–90 (2d Cir.), *as clarified*, 17 F.4th 368 (2d Cir.

25  2021) (per curiam) (collecting authority); *Stormans*, 794 F.3d at 1081–82.  "Indeed, *Smith* itself

26  specifically held that a scheme that included a type of medical exemption—by not criminalizing

27  the use of controlled substances when prescribed by a medical practitioner—was nonetheless

1  generally applicable under the Free Exercise Clause." *We The Patriots*, 17 F.4th at 289–90

2  (citing 494 U.S. at 874).

3      Plaintiffs also argue the state's decision to include a medical exception shows it has

4  treated secular objections more favorably than religious objections, which in their view

5  undermines the state's claims about its purposes. *See* Opp'n at 14–15. This argument is

6  unpersuasive. As summarized in the background section above, the government's interest in

7  passing SB 277 was protecting the public health by increasing vaccination rates above the level at

8  which the broader "community" or "herd" would cease to be immune, especially for those who

9  could not be vaccinated. The medical exception serves this interest by exempting the few

10  students whose health would suffer if they were vaccinated. *See, e.g.*, Rep. Cal. Assemb.

11  Committee on Health on Sen. Bill 276 at 7–11 (2019), Req. J. Not. Ex. 15, ECF No. 38-2

12  (discussing vaccine safety in context of medical exception). California's law, like the

13  Connecticut law in *We The Patriots*, "promotes the health and safety of vaccinated students by

14  decreasing, to the greatest extent medically possible, the number of unvaccinated students (and,

15  thus, the risk of acquiring vaccine-preventable diseases) in school." 76 F.4th at 153 (emphasis

16  omitted). Moreover, by declining to make an exception based on personal beliefs, the state

17  "decrease[s] the risk that unvaccinated students will acquire a vaccine-preventable disease by

18  lowering the number of unvaccinated peers they will encounter at school." *Id.* By the same

19  token, the medical exception "allows the small proportion of students who cannot be vaccinated

20  for medical reasons to avoid the harms that taking a particular vaccine would inflict on them." *Id.*

21  A student whose parents object to vaccination on religious grounds, by contrast, is not avoiding

22  adverse health consequences by foregoing vaccination. As discussed in the legislative history of

23  S.B. 277, the lawmakers who supported SB 277 believed in-person attendance would put that

24  student's health at greater risk. *See, e.g.*, Rep. Cal. Assem. Comm. on Health (SB 277) at 4–6

25  (discussing immunity and measles outbreaks). The health of others who cannot safely be

26  vaccinated also would also be at greater risk. *See id.* at 4–5. For these reasons, as the Ninth

27  Circuit has held, an exemption based on a student's health and medical reasons is not

28  "comparable" to an exemption based on personal beliefs. *See Doe*, 19 F.4th at 1178.

1      Plaintiffs argue similarly that California has impermissibly made exceptions to its

2  vaccination rules for homeschooling and independent studies without making a comparable

3  exception for religious objections.  *See* Opp'n at 16.  This, they argue, shows its law is not neutral

4  and generally applicable.  *See id.*  But students in a homeschool or independent study program

5  plainly differ from students who, like the plaintiffs' children, would attend school in person full

6  time if they could under a religious exception.  Children who attend homeschool or independent

7  study are much less likely to regularly come into close personal contact with large numbers of

8  other students for many hours every weekday.  *See Royce*, 2025 WL 834769, at *9–10.

9  Unvaccinated homeschool and independent study students are unlikely to contract infections from

10  students in a classroom, and students in a classroom are unlikely to contract infections from them.

11  By contrast, students whose parents object to vaccination on religious or philosophical grounds

12  could attend classroom instruction in person on a regular basis, and both they and their classmates

13  would be at greater risk.  *See, e.g.*, Rep. Cal. Assem. Comm. on Health (SB 277) at 5.  The

14  exception for students in a homeschool or independent study program is not comparable to the

15  religious exception plaintiffs seek.

16      Plaintiffs attack the homeschool and independent study exception from a different angle in

17  their supplemental briefing.  Even homeschooled children, they argue, "socialize with

18  schoolchildren, participate in sports leagues, patronize arcades, and attend worship services with

19  schoolchildren."  Pls.' Suppl. Br. at 5.  The law would be more neutral, they suggest, if it also

20  "required children to be vaccinated before participating in youth sports leagues, attending movies,

21  and going to summer camp."  *Id.*  But plaintiffs offer no reason to believe any of these other

22  activities are as universal as school attendance, nor that they bring so many children together into

23  the same rooms for many hours every weekday for many years.

24      Plaintiffs' brief reference to the exception for students with an IEP is similarly

25  unpersuasive.  "[I]n-person attendance by unvaccinated students with an IEP is not comparable to

26  in-person attendance by students with religious objections to vaccination because federal law—

27  the IDEA—requires that a school follow certain procedures before it can bar students [with IEPs]

28  from in-person attendance."  *Doe*, 19 F.4th at 1179 (citation and quotation marks omitted); *see*

1   *also Royce*, 2025 WL 834769, at *10 (reaching same conclusion in reliance on *Doe*).  At hearing,

2   plaintiffs' counsel acknowledged federal protections would likely override any conflicting state

3   immunization requirements but emphasized how SB 277 makes an express exemption.  The court

4   cannot agree SB 277 falls short of being generally applicable under *Smith* just because it carves

5   out an exception for those with federal statutory rights.  *See, e.g.*, Rep. Cal. Assem. Comm. on

6   Health (SB 277) at 8 (discussing IEPs and the IDEA).

7        Plaintiffs also contend "there is no way to reconcile" California's claim that it is simply

8   attempting to protect the public health and safety with the state's decision to permit several

9   categories of students to attend school temporarily, without first producing their immunization

10  records.  Opp'n at 16.  As summarized in the background section above, state law makes

11  allowances for foster children, homeless children, migrant children and children in military

12  families.  If students in these categories transfer from an old school to a new school, they must be

13  admitted to the new school even if they cannot immediately produce their immunization records.

14  And if their medical records cannot be located within thirty days, then they must submit to

15  vaccination within a few days' grace period.  A student's conditional admission to a new school

16  for a short time does "not raise a serious question concerning the mandate's general

17  applicability." *Doe*, 19 F.4th at 1179.  The extra time is essentially an administrative grace

18  period—a few weeks to find the missing paperwork.  By contrast, under the exception plaintiffs

19  seek, students whose parents object to vaccination on religious grounds could attend any school,

20  new or old, indefinitely without any vaccination, ever.  In short, the permanent religious

21  exception plaintiffs seek differs starkly from the temporary exceptions they point to.

22       Plaintiffs hypothesize in their supplemental brief that the number of students with missing

23  paperwork might actually be quite high, but as they conceded at hearing, their argument is pure

24  unsupported hypothesis.  *See* Pls.' Suppl. Br. at 7 (urging court to "conceive of a school in Fresno

25  County" with specific characteristics).  Arguments about hypotheticals and possibilities do not

26  suffice in response to a motion to dismiss for failure to state a claim.  *See Twombly*, 550 U.S.

27  at 570.

28

1    Finally, plaintiffs argue in their supplemental brief that the exceptions to the state's

2 vaccination requirement actually are quite broad, reaching as much as thirty percent of all

3 California schoolchildren, whereas only a "tiny" sliver of the population—one percent or less—

4 previously relied on the personal beliefs exception. *See* Pls.' Suppl. Br. at 3–5 & nn. 1–4. The

5 pleadings include no allegations about these statistics; nor do plaintiffs' principal briefs. The

6 court assumes for present purposes it would be appropriate to consider plaintiffs' citations despite

7 their absence from previous briefing. The court also assumes without deciding that it could either

8 take judicial notice of the cited statistics, Fed. R. Evid. 201(b)(2), as the district court did in

9 *Royce*, 2025 WL 834769, at *8, or consider those statistics after a further amendment to the

10 complaint, *see* Fed. R. Civ. P. 15(a)(2). Even then, the cited statistics would not show any

11 exceptions "swallow the rule," as plaintiffs contend they do. Pls.' Suppl. Br. at 3.

12    It is unclear at the outset how plaintiffs reached their thirty-percent estimate. By the

13 court's calculation, the sources they cite add up to only about twenty percent, not thirty. *See* Pls.'

14 Suppl. Br. at 4 nn.1–3; Def.'s Suppl. Reply at 2 n.2. It also seems a simple addition of each

15 category would likely count at least some students more than once, as counsel agreed at hearing.

16 A student can both have an IEP and attend a homeschool or independent study program. Adding

17 the percentages of students in those categories would double-count students in both.

18    More fundamentally, however, plaintiffs' argument relies on the dubious assumption that

19 the various exceptions to SB 277 are equivalent to the hypothetical exception they seek. Fourteen

20 percent of California schoolchildren might indeed have an IEP, for example, but nothing suggests

21 the entirety of that fourteen percent attends school without vaccination. It might be that only one

22 percent or a tenth of a percent are not vaccinated; plaintiffs do not offer any relevant allegations

23 or judicially noticeable information. Compare this to the students who would take advantage of a

24 personal beliefs exception. By definition, all of those students would attend school without

25 vaccination. So even if the number of students claiming an exception for personal beliefs is low,

26 it might still be higher, even much higher, than the number of students who refuse vaccination on

27 the basis of the IEP exception. As Director Pan argues succinctly and persuasively in her

28 supplemental reply, "the proper focus for assessing risk is the number of unvaccinated individuals

29

1     within those categories, not the overall numbers of individuals who may fall within those

2     categories." Def.'s Suppl. Reply at 2. In short, the cited statistics do not support plaintiffs' case.

3     To be sure, they may not support the defense case, either. In any event, the court does not rely on

4     those statistics to conclude the complaint does not state a claim.

5          **D.      SB 277 is unlike vaccination requirements other courts have enjoined.**

6          In only a few cases have courts concluded that First Amendment challenges to vaccination

7     rules were viable. Plaintiffs cite some of these cases in their opposition. *See* Opp'n at 15–17.

8     None is comparable or persuasive.

9          In some of the cases, the government had provided broad discretionary exceptions. In

10    Mississippi, for example, a state law permitted people to claim a temporary exception from the

11    state's vaccination law based on the opinion of a local health officer that the exception "will not

12    cause undue risk to the child, the school or the community." *See Bosarge v. Edney*,

13    669 F. Supp. 3d 598, 610 (S.D. Miss. 2023) (quoting Miss. Code Ann. § 41-23-37). That is, the

14    law granted local health officers discretion to make ad hoc, temporary exceptions to the vaccine

15    rule. The district court applied the tried-and-true rule that when an otherwise neutral and

16    generally applicable state law imposes an incidental burden on religion, courts strictly scrutinize

17    that law if it nevertheless gives officials discretion to make exceptions from one person to the

18    next. *See id.* at 617 (citing *Fulton*, 593 U.S. at 535–38). The state's attorney general conceded

19    the state's law would not withstand strict scrutiny, and the court found the plaintiffs were likely

20    to succeed on the merits of their claim; the plaintiffs ultimately were entitled to a preliminary

21    injunction. *See id.* at 617, 619–20. California, by contrast, uses a standardized certification and

22    employs a strict system of review, as summarized above, and as laid out in state law. *See* Cal.

23    Health & Safety Code § 120372; *see also* 2019 Cal. Stat. Ch. 278 (S.B. 276) (amending and

24    tightening the medical exception).

25         The Maine law in *Fox v. Makin* also provided broad exceptions. *See* No. 22-00251, 2023

26    WL 5279518, at *7–10 (D. Me. Aug. 16, 2023). First, it made an exception for any students who

27    could produce a "written statement" from any doctor, nurse practitioner or physician assistant

28    who thought immunization "may be medically inadvisable"—no explanation required—and thus

30

1    imposed none of the documentation and certification requirements of the California law, as

2    summarized above. *See id.* at *7; Me. Rev. Stat. Ann. tit. 20-A, § 6355(2). The Maine law also

3    included an exception for any students whose parents offered a "written assurance" the child "will

4    be immunized within 90 days," without any of the follow-up requirements imposed in California's

5    statute, as summarized above. 2023 WL 5279518, at *7; Me. Rev. Stat. Ann. tit.

6    20-A, § 6355(1). Given the breadth of these exceptions and how they operated in combination,

7    the district court found it plausible to infer the plaintiffs might ultimately show the exceptions

8    undermined the state's interest in public health, so the court applied strict scrutiny and denied the

9    state's motion to dismiss. *See* 2023 WL 5279518, at *9–10.

10          Another similar example is found in the district court's decision in *UnifySCC v. Cody*, No.

11   22-01019, 2022 WL 2357068 (N.D. Cal. June 30, 2022). The plaintiffs sought a preliminary

12   injunction against a county's requirement that its employees be vaccinated against COVID-19.

13   *See id.* at *1. For the most part, the requirement was neutral, but the county had created a system

14   of exemptions that was not neutral. *See id.* at *2–3, 10–12. The county permitted its employees

15   to forego a COVID-19 vaccination if they objected based on a religious belief or if they had a

16   disability or medical condition. *See id.* at *2. The county then categorized jobs based on the risk

17   of COVID transmission. *See id.* Exempt employees could work in low-risk and medium-risk

18   jobs if they wore a mask and were tested for COVID-19. *Id.* But the county did not allow

19   exempt employees to work in high-risk jobs. *See id.* at *3. It offered to help them find jobs in

20   lower-risk positions, but it gave preference to employees with disabilities or medical exceptions.

21   *See id.* In other words, employees who had obtained a religious exemption and who were

22   working in high-risk jobs were sent to the back of the line if they wanted a transfer. *See id.*

23   at *10. That aspect of the county's policy was subject to strict scrutiny and, ultimately, the court

24   preliminarily enjoined it. *See id.* at *10–13. No allegations in this case show California has

25   similarly singled out those with religious beliefs, only to then put them at a disadvantage.

26          Other vaccine requirements have come under closer scrutiny based on their practical and

27   perhaps unintended effects. In *Bacon v. Woodward*, for example, a group of firefighters

28   challenged a city proclamation that required them to be vaccinated against COVID-19. *See*

1     104 F.4th 744, 747 (9th Cir. 2024).  According to the complaint, the city had terminated them for

2     refusing to be vaccinated, but then filled the vacant positions with private ambulance contractors

3     and firefighters from other nearby fire departments.  *See id.* at 748–49.  The city said it had done

4     this to stop the spread of COVID-19, but according to the plaintiffs, the replacements were not

5     themselves subject to any mandatory vaccination requirements.  *See id.*  For that reason, it was

6     plausible to infer the firefighters could ultimately show the city had "undermined its asserted

7     interest," which could in turn show its policy was not actually neutral, generally applicable and

8     not narrowly tailored to its interests—and therefore unconstitutional.  *See id.* at 752.  Here the

9     complaint makes no plausible claims of similar unintended consequences.

10        In sum, unlike the laws and regulations that triggered strict scrutiny in *Borsarge*, *Fox*,

11     *Bacon*, *UnifySCC* and other cases, California's school vaccine requirement does not permit state

12     officials to make ad hoc, discretionary or unfair exceptions on a case-by-case basis.  No

13     allegations in the complaint show its practical consequences are at odds with the state's asserted

14     interest of protecting the public health and safety.  Plaintiffs have had two opportunities to amend

15     their complaint in response to motions to dismiss, but have not been able to state claims for relief.

16     In addition, as summarized above, California's school vaccination laws have been challenged

17     many times before, in each instance without success.  The court therefore declines to permit any

18     further amendments to the complaint.  *See Royce*, 2025 WL 834769, at *14 (dismissing without

19     leave to amend for similar reasons).

20     **IV.    CONCLUSION**

21        The motion to dismiss is **granted without leave to amend**.  The Clerk's Office is directed

22     to **close the case**.

23        IT IS SO ORDERED.

24     DATED: June 17, 2025.

_____
SENIOR UNITED STATES DISTRICT JUDGE